**Stephen M. GOLDBERG,
Plaintiff-Appellant,**

v.

**NATIONAL LIFE INSURANCE
COMPANY OF VERMONT,
Defendant-Appellee.**

**No. 1191, Docket 85–7099.**

United States Court of Appeals,
Second Circuit.

Argued May 15, 1985.

Decided Oct. 1, 1985.

Morton H. Feder, Garden City, N.Y. (Rivkin Leff Sherman & Radler, Garden City, N.Y., of counsel), for plaintiff-appellant.

Grant S. Lewis, New York City (Thomas G. Rohback, LeBoeuf, Lamb, Leiby & MacRae, New York City, of counsel), for defendant-appellee.

Before LUMBARD, OAKES and CARDAMONE, Circuit Judges.

OAKES, Circuit Judge:

In this weird, if not to say bizarre, case an insured under a disability policy appeals an adverse judgment after a jury verdict in his suit against the disability insurer and also appeals the granting of the insurer's counterclaim for $33,628.24 in disability benefits paid the insured before discovery of his lack of supposed psychiatric disability. Appeal of the judgment is on the basis that the court erred in excluding some psychiatric testimony proffered as rebuttal. Appeal of the judgment on the counterclaim is on the basis that even though the policy required the insured to be under the care and attendance of a licensed physician and the parties had stipulated that the insured was "not under the care of a licensed doctor for psychiatric treatment or therapy," on one occasion he did see one doctor, a family practitioner, who prescribed an anti-arthritic drug and a muscle relaxant. We affirm the judgment of the United States District Court for the Eastern District of New York, Mark A. Costantino, Judge.

In 1977 Stephen Goldberg, a designer, owned Steve Gee, Ltd., a garment manufacturer that had lost money in the fiscal year ended July 31, 1977, and lost over $200,000 in the fiscal year ended July 31, 1978, before it ceased doing business in fiscal year 1979. In late 1977 Goldberg took out two disability insurance policies, each providing benefits of $2,000 a month, one with National Life Insurance Company of Vermont ("National Life"), the appellee here, and the other with the Equitable Life Assurance Society of the United States. His application to National Life, where he was asked to list "all disability insurance in force," identified $1,000 per month coverage with Guardian Life Insurance Company, but failed to reveal similar $1,000 policies with three other insurers. It also listed his earned income as $90,000 whereas the total income reported on his federal tax return was just under $36,000. He also said that there were not pending any "other negotiations for disability or life insurance." On questioning by the National Life medical examiner in December, 1977, he denied previously receiving disability compensation. He had, in fact, however, filed a claim in 1973 for disability involving vertigo, trauma to head, nervousness and depression, some three months following

an automobile accident, a claim which was ultimately paid by his insurer. Goldberg also denied receiving professional treatment or advice for nervous or mental trouble although he had seen numerous psychiatrists and psychologists over a period of time. His application to Equitable Life—made the day after he was examined by the National Life medical examiner—contained similar misrepresentations as to his income, other insurance, and prior receipt of disability payments, and denied having any other application pending.

As a result of the issuance of these policies, in the event of his total disability, Goldberg's income, together with his Social Security, would have given him in excess of $100,000 a year tax-free, and his insurance premiums would have been waived. In February, 1979, he converted a $600,000 term life insurance policy he had with another insurer to two endowment policies, making the benefit payable to Goldberg himself at age 65, providing for premiums of $22,000 a year, but with waiver of premium in the event of disability.

In 1978 Goldberg's income was only $25,-195 and his annual insurance premium obligations as of February, 1979, exceeded that amount, unless of course he became disabled. In June, 1979, his business failed and his adjusted gross income for 1979 was $12,200.

In January, 1980, Goldberg telephoned National Life to make certain that his premiums were fully paid and he asked that the call be confirmed in writing. In an interesting coincidence, on February 9, 1980, the day after the Equitable disability policy had become no longer contestable for fraud in the inception, Goldberg claimed that while he was driving in Manhattan his car was hit from behind and that when he got out of his car two black muggers hit him twice with a gun, once on the head and once across the bridge of his nose, causing his glasses to be broken. There were no witnesses to the "mugging" or evidence before the jury (other than Goldberg's own testimony) that a mugging in fact occurred. Goldberg did, however,

go to the police department to report the mugging and he drove himself there. Then he was taken to St. Vincent's Hospital in Manhattan for a medical examination, but the hospital found "no evidence of trauma" to his head and x-ray films of his skull and cervical spine were negative for fracture. His condition on discharge was "good." A registered nurse's notes indicated that there were "no obvious signs of trauma noted," and that he "remembers events of assault but does not remember events of yesterday." He was given some Gelusil for his stomach. Two days later he saw an old friend, Dr. Irving Leonard Graff, who, after examining Goldberg, concluded "there was nothing medically wrong with him at that time, at least just from the fact that he was mugged." Dr. Graff did not see Goldberg between April 7, 1980, and April, 1982. Cross-examination established that Dr. Graff had several years earlier certified Goldberg to be disabled by the 1972 automobile accident in which he claimed to have suffered a trauma to his head. Dr. Graff had advised at least two disability insurance carriers that Goldberg was disabled and had been treated by him on twenty-three separate occasions, though in fact his records showed that he had only treated Goldberg once in connection with that accident.

On Monday, February 11, 1980, the first business day after the alleged mugging, Goldberg telephoned National Life and each of the other companies with which he had disability policies and requested that they send disability claim forms to him. On March 4, he filed a claim with National Life, identifying Dr. Renatus Hartogs as his "attending physician" and again naming Guardian Life as the company with which he had other disability insurance. National Life began making payments of $2,000 a month to him, and waived the premiums that otherwise would have been due on this policy.

In late August, 1980, Goldberg filed another claim form with National Life stating that "I will not be able to do any type of work again. I will not be returning to

work again," and attached a statement from Dr. Hartogs who said that Goldberg "is incapable to do any type of work again" and that his sickness or injury was "post-traumatic stress disorder, chronic type." The doctor apparently certified Goldberg's claims with the various other insurance companies, but when asked by National Life whether Goldberg had any "other health coverage" only identified Guardian Life and Social Security. At this time National Life became a little suspicious and arranged for an examination by an independent doctor, Dr. Robert Meineker.

Dr. Meineker's examination was informative, to say the least. On interview, Goldberg "was an extremely disheveled man looking slightly younger than his 39 years of age. He appeared harrassed [sic] with deep circles under his eyes and seemed to be haunted." He had not shaven for several days, "his hair was totally uncombed." He wore a rumpled lavender shirt and extremely dirty dungarees several sizes too large for him. The doctor's report indicated that Goldberg

> rushed into the office and opened all the doors asking if there were any black people hiding behind them. He had two plastic straws sticking out of his mouth which he was chewing on and claimed that he required these to keep his airway open. About every thirty seconds he gave an expiratory grunt which he claimed was involuntary. He had a handful of aerosol breath sweeteners and kept squirting peppermint into his mouth

whenever he was not talking and had another device which "looked somewhat like mace" which he indicated he would use on anyone who tried to attack him. He seemed to feel that there was a general conspiracy by blacks to destroy him and spoke of blind spots, nausea, blackouts, trouble sleeping, and nightmares. It was noted that Goldberg, at the age of 39, had "slept with his mother since the accident." However, he was oriented and seemed to have no difficulties with memory and was of higher than average intelligence, but was perplexed by feelings of violence against his mother and felt suicidal. In the

end, he did convince Dr. Meineker that "most of his behavior and reported thinking was probably genuine." The doctor concluded that he had great feelings of guilt because he was going to a discotheque, against his mother's wishes, when he was attacked, and that those feelings exaggerated his dependency on his mother and brought on what appeared to be paranoid delusions, depression, failure to work, and marked disturbances of behavior. The doctor concluded that the man was "currently totally disabled psychiatrically," noted that Goldberg "consults Dr. Hartogs three times a week but refuses all treatments except psychotherapy," and that prognosis was impossible.

Outside the doctor's office, Goldberg's life was not quite as dismal as he made it out to be. In November, 1980, for example, he wrote checks to Diners Club, Barney's, Columbia Tour, and the Concord Hotel. In January, 1981, he opened a Cash Management Account with Merrill, Lynch, listing his occupation as "retired," and by Spring of 1981 was writing checks to four different securities brokers. Some time after receipt of Dr. Meineker's report, National Life learned that Goldberg had disability insurance with a number of other companies and that "Dr." Hartogs had been forced to surrender his license some years earlier. The insurance companies retained an independent investigator who put Goldberg under surveillance. He was observed driving his car, walking a dog, going to restaurants, attending an Overeaters Anonymous meeting, was evidently clean-shaven and well-groomed whenever he was observed, and wore "Sergio Valente" jeans, a gold watch, and a fur coat. Upon learning some of these facts, Dr. Meineker expressed the view that he could have been deceived and suggested further psychological evaluation.

National Life contacted St. Vincent's Guidance Center which had a psychologist, Dr. Carolyn Corbett, examine Goldberg. While he was snorting and spraying his throat and claimed to have difficulty breathing, at no time did he become upset

about or adversely affected by the psychologist's smoking. While he stated that he was upset about the black people in the waiting room, he did not seem tense and his facial muscles and general body stance appeared relaxed. Describing his symptoms, which "did not cluster to fit any known psychiatric disorder," he was lucid, organized and oriented. He "acted out various paranoid symptoms" for the psychologist, for example showing her a tap he put on his therapist's telephone. Yet he was quite open about himself and his symptoms, even to the point of telling the psychologist "that he had intercourse with his mother."

On taking a psychological exam, Goldberg showed little motivation, did not speed up on time tests, was not interested in how well he was doing, and shuffled blocks around in a random fashion without showing the slightest effort to construct the designs. On the whole his approach "appeared to be to perform poorly." His IQ tested out in the moderately mentally retarded range and he achieved only a second-grade level in arithmetic and a fifth-grade level in reading, even though both skills normally remain intact despite serious emotional difficulties. He gave correct responses to more difficult questions and erroneous responses to less difficult ones. The psychologist concluded that his "exhibited symptomatology and test record appears to be deliberate malingering" and that "[g]iven his ability to control his behavior and the situation, to try to con others into believing him psychiatrically incompetent, he should be able to use these same ego resources to function effectively in every day life." His IQ scores were just too low considering that he was a high school graduate and had been involved in business with some success.

Upon receipt of Dr. Corbett's advice National Life stopped making payments in May, 1981, was sued in July, 1981, and brought a counterclaim for the payments that it had made between April, 1980, and May, 1981.

At the trial before Judge Costantino counsel for the plaintiff called not only his own witnesses, but National Life's. He called Dr. Meineker, and he called a friend of Goldberg's who joined the latter in Montreal for a weekend. Counsel called a former employee of Goldberg's who had formed his own company after Steve Gee, Ltd. closed who testified that Goldberg had given him business advice well after the mugging incident. Dr. Gagliardi, who observed Goldberg snort, use mouth spray, speak rapidly, and glance around the room, also testified. Counsel called another former business associate for whom Goldberg had done design work after the mugging. Counsel then put in the deposition of Dr. Bruce Lindberg, National Life's Associate Medical Director, who brought the surveillance reports to the attention of Dr. Meineker, and was involved in the decision to terminate the benefits. Counsel even called Dr. Corbett, who told of Goldberg's scoring in the mentally retarded range on the IQ test and being unable to name a single President of the United States after 1900 (Goldberg answered only George Washington when asked to try); Dr. Corbett testified that Goldberg was a malingerer. Counsel called Dr. Graff, Goldberg's old friend, and called Dr. Daniel Powsner, who said that he had been treating Goldberg since May, 1981, and was of the opinion that Goldberg was permanently psychiatrically disabled because of post-traumatic stress disorder; Powsner also testified that while Goldberg may have had some prior psychiatric problems, it was the alleged mugging which caused the disabling condition. Goldberg's counsel also called the private detective employed by National Life who observed Goldberg under surveillance, and counsel then said that he would call as his final two witnesses Margaret Arthur, an attorney for National Life, and the plaintiff himself. But when trial resumed, counsel put in a deposition of the Claims Administrator Supervisor for National Life, which brought out the fact that Goldberg's Dr. Hartogs, who had signed the disability forms as the attending physician, was not licensed. Mrs. Arthur

testified as to Goldberg's over-insurance and numerous misrepresentations and explained that "[w]e tried to believe him and we just couldn't ... we just ran out of the ability to believe." At the conclusion of her testimony, counsel announced that he had just one more witness, the plaintiff himself.

Goldberg gave a detailed account of the mugging, described his education and career in the garment industry, including specific fashions he created and the manufacturing process from design to sale, recounted the details concerning his purchase of various insurance policies and past insurance claims, and explained various financial transactions with his brokers. Apparently because his testimony was quite lucid, coherent, and detailed, National Life elected not to cross-examine him at all. Following the verdict for National Life the court entered judgment on the counterclaim by National Life on the basis that the unlicensed "Dr." Hartogs who had certified Goldberg's claims did not satisfy the policy requirements.

## DISCUSSION

The appellant argues that he was not permitted to rebut the psychological test evidence adduced from Dr. Corbett with testimony of Dr. Brown, a proffered wit-

ness. On more than one occasion appellant's counsel had advised the court that he had "one more witness," namely Goldberg himself. He then added, after opposing counsel stated he wanted to think about how many, if any, witnesses he wanted to call—appellant had called them all, it will be remembered—that "I have a possible rebuttal." The judge stated that he would determine whether there would be rebuttal. At the close of Goldberg's case, the defense rested so that there was nothing to rebut.

Appellant now contends that he had told opposing counsel that if the latter elicited the contents of Dr. Corbett's report on cross-examination, he would then call Dr. Brown on his direct case. Assuming that he did say this, he did not call Dr. Brown on his direct case. Moreover, appellant's counsel himself elicited the entire report of Dr. Corbett on *his* examination of her.

■ Moreover, though counsel now asserts that he indicated that his "rebuttal would, *if necessary*, be limited to challenging Dr. Corbett's psychological testing and interpretation" (appellant's brief p. 11—emphasis added) without making reference to Dr. Brown's diagnosis of paranoid schizophrenia, the record does not make this at all clear.[1] This being true, the trial court's

---

1. The record indicates that Mr. Feder wanted Dr. Brown to give his diagnosis of schizophrenia in rebuttal to the psychologist's conclusion of malingering.

MR. FEDER: I don't want to expound at length right now with regard to the record. I want to show you what my belief was, namely, that you would not permit Dr. Brown to testify.

THE COURT: Testify to what?

MR. FEDER: Two areas. The first area would be, Dr. Brown was requested by Dr. Hartogs [with]out [ ] the knowledge [sic] of the pendency of any lawsuit or any claim, to conduct psychological testing of Mr. Goldberg, similar to what Dr. Corbet [sic] was asked to do.

⋅    ⋅    ⋅    ⋅    ⋅

The second area that he would direct himself to your Honor, is that he was deposed on this. It's no surprise to counsel, his [dis]agreement with the findings and testing procedures of the defendants appointed psychologist, Dr. Corbet [sic]. (JA–781)

⋅    ⋅    ⋅    ⋅    ⋅

MR. FEDER: Your Honor will recall, that the psychological [sic] testing by Dr. Corbet [sic] came about because of the psychiatrist who for the defendant said that it might be helpful in formulating a diagnosis.

That's exactly the same reason that Dr. Brown was asked to do psychological testing, because it might be helpful in formulating a diagnosis.

Again, he formulated a diagnosis and the findings he submitted in his psychological report to the psychiatrist and that is what I have found upon examination.

Now, the psychiatrist comes out and says that's something different—

That psychologist gives the diagnosis of mental illness—

THE COURT: Not really. He can define mental retardation.

MR. FEDER: Your Honor, if the psychologist's tests conclude that the party is malingering, that is based upon the psychologist bringing to bear his or her knowledge of the field in order to make that conclusion from the tests,

exclusionary ruling may properly be rested on its discretion under Fed.R.Evid. 403 not to permit evidence changing the plaintiff's theory of the case after the plaintiff had already rested because it is too confusing to the jury. Rule 403 requires even-handedness. *See United States v. Sellers,* 566 F.2d 884 (4th Cir.1977) (error in permitting the prosecution to adduce expert testimony that an identification—positive or negative—could not be made from surveillance photos while the defense's expert was not allowed to testify that the person pictured was not the defendant); *see also Breidor v. Sears, Roebuck & Co.,* 722 F.2d 1134, 1140–41 (3d Cir.1983) (error to exclude plaintiff's expert evidence re cause of fire while permitting defendant's expert evidence). It does not, however, require the court to permit calling expert witnesses who would change the theory of the case at the eleventh hour, so to speak. *See United States v. Toner,* 728 F.2d 115, 121 (2d Cir.1984) (excluding evidence likely to confuse jury); *see also United States v. Schmidt,* 711 F.2d 595, 598–99 (5th Cir. 1983) (same; expert witness), *cert. denied,* —— U.S. ——, 104 S.Ct. 705, 79 L.Ed.2d 169 (1984).

There are other reasons besides confusion of the jury that will support exclusion of testimony in this instance. The plaintiff had rested; he knew the purport of—indeed had himself elicited—Dr. Corbett's testimony. The trial had taken 13 days instead of the two envisaged. The court properly rested its ruling on Rule 403 concerns as to undue delay. *John McShain, Inc. v. Cessna Aircraft Co.,* 563 F.2d 632, 636 (3d Cir.1977); *SCM Corp. v. Xerox Corp.,* 77 F.R.D. 10, 13–15 (D.Conn.1977). We do not find error; at any rate it is hard to imagine how any error in this case could have been anything other than harmless.

The court quite correctly granted judgment n.o.v. on the counterclaim. In view of the stipulation that Dr. Hartogs was not a licensed doctor from February 9, 1980, to the present, the fact that he had

certified the claim on National Life as "Attending Physician," and the provision of the policy that Goldberg had to be "under the care and attendance of a licensed physician ... during any period of claimed disability," the court properly allowed the claim for return of benefits paid under a mistake of fact, absent reliance by the other party, with prejudice. *Allcity Insurance Co. v. Bankers Trust Co.,* 364 N.Y. S.2d 791, 80 Misc.2d 899 (1975). Appellant's latter-day claim that Dr. Graff qualifies, on the basis of the one occasion on which Goldberg visited him, fails because Goldberg himself stipulated that "[f]rom February 9, 1980 to May 30, 1981 plaintiff was not under the care of a licensed doctor for psychiatric treatment or therapy." Plaintiff thus conceded that Dr. Graff was not providing psychiatric care during the period of claimed disability, though Goldberg's alleged infirmities were psychiatric in nature. We find the district court was correct in holding as a matter of law that the only reasonable interpretation of the policy is that plaintiff was required to be under the care of a licensed physician treating the plaintiff for the condition for which he claimed disability.

Judgment affirmed.

---

if a psychologist has concluded that the patient is a paranoid schizophrenia. Whatever

you want to designate. It's the same expertise which is being brought to bear. (JA–785–86)