**FRIENDSHIP HEIGHTS ASSOCIATES, an Illinois Joint Venture, c/o First Condominium Development Co., Appellants,**

v.

**VLASTIMIL KOUBEK, A.I.A., Tnemec Company, Inc., A Missouri Corporation, Appellees.**

**FRIENDSHIP HEIGHTS ASSOCIATES, an Illinois Joint Venture, c/o First Condominium Development Co., Plaintiff,**

v.

**VLASTIMIL KOUBEK, A.I.A., Appellant,**

**and**

**Melrose Waterproofing Company, a Pennsylvania Corporation; Ronald D. Mayhew, Inc., A Virginia Corporation; United Pacific Insurance Company, Defendants,**

**and**

**Tnemec Company, Inc., A Missouri Corporation, Appellee.**

**Nos. 83–2204(L), 83–2205.**

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1985.

Decided Feb. 27, 1986.

Linda Richards (Shale D. Stiller, Frank, Bernstein, Conaway & Goldman, on brief), for Friendship Heights.

Jonathan B. Clairborne, Danny B. O'Connor (Howard G. Goldberg, Smith, Somerville & Case, George D. Solter, Whiteford, Taylor, Preston, Trimble & Johnson, on brief), for Koubek and Tnemec Co.

Before MURNAGHAN, ERVIN and SNEEDEN, Circuit Judges.

SNEEDEN, Circuit Judge:

After purchasing an apartment building in Chevy Chase, Maryland, Friendship Heights Associates undertook an extensive renovation program which included the repainting of the building's exterior concrete surface. Unfortunately, soon after the building was painted, the paint began to peel. Friendship Heights then brought this diversity suit, based on tort and contract principles, against Vlastimil Koubek, A.I.A., the architect who drafted the specifications for the repainting; Melrose Waterproofing Company, the general contractor for the exterior repair of the building; Ronald D. Mayhew, the subcontractor who painted the building, Tnemec Company, Inc., the manufacturer of the paint specified by Koubek; and United Pacific Insurance Company, the insurer that furnished the bond for the painter and the contractor.

A four-day bench trial resulted in a judgment favoring all of the defendants, 573 F.Supp. 100 (D.Md.1983). The plaintiff appeals from the judgment as it pertains to defendants Koubek and Tnemec. Koubek appeals the district court's dismissal of its cross-claim against Tnemec.

Friendship Heights argues that the district court erred in refusing to qualify two of its witnesses as experts. The trial court ruled that Dr. Stella L. Marusin, a chemical and ceramic engineer, could not give her opinion as to the cause of the peeling paint. The court indicated that Dr. Marusin lacked practical experience in coatings over concrete. Joint Appendix at 101–102 and 168–169. The district court also refused to allow William Edward White, an architect and structural engineer, to testify as to whether Koubek, if it had performed with reasonable care, would have specified a different surface preparation method. The court apparently did not qualify Mr. White as an expert because he failed to provide a sufficiently precise definition of the architectural standard of care. Joint Appendix at 123–126, 153, 156.

Friendship Heights argues that the district court's refusal to qualify these two witnesses as experts was extremely detrimental to its case. In support of this contention, it points to the district court's findings that, while Friendship Heights had an arguable claim against Koubek, it had

failed to show "why the paint peeled or that the architect would have been able to prevent it if he performed properly." Joint Appendix at 54. We find the district court abused its discretion in refusing to qualify Dr. Marusin and Mr. White as experts. Accordingly, we reverse the judgment of the district court as it relates to Koubek and remand for a new trial. We affirm the court's decision regarding the plaintiff's claim against Tnemec and Koubek's cross-claim against Tnemec.

## I.

In preparation for converting the building's apartments into condominiums, Friendship Heights decided to substantially renovate the complex called "The Willoughby." Repainting the building's concrete exterior was a major aspect of the renovation. According to testimony at trial, The Willoughby was sorely in need of repainting. Only ten percent of the old paint remained intact. Forty to fifty percent of the paint was peeling, and the remainder had turned to chalk. Joint Appendix at 80. Friendship Heights hired Koubek, who had designed and supervised the original construction of The Willoughby, to prepare a set of specifications for repainting the building. Charles M. Stover, an employee of Koubek's firm, prepared the specifications. His specifications called for wire brushing the concrete exterior and for blowing off the surface with high pressure air to dislodge dust and debris. Joint Appendix at 514. Mayhew, the painting subcontractor, prepared the surface according to these specifications. By the time the project was finished, however, the new paint had begun to peel wherever old paint had not been removed. Joint Appendix at 457.

Friendship Heights contended at trial that the specifications were inadequate because they did not require sandblasting or waterblasting the exterior to remove all existing paint. It maintained that, if Stover had complied with a professional standard of reasonable care, he would have recommended a method of surface preparation other than wirebrushing. Friendship Heights elicited testimony that Stover did not visit The Willoughby at the time he prepared the specifications, Joint Appendix at 331; that he made no attempt to determine why the old paint was peeling, Joint Appendix at 332; that he did not find out how many times the building had been painted, Joint Appendix at 332; that he ordered no testing on the existing paint or concrete, Joint Appendix at 331; and that, he did not order any test samples to be placed on The Willoughby, Joint Appendix at 329.

Stover, on the other hand, maintained that he complied with the professional standard of care required of him. He testified that he visited the building approximately one month before preparing the specifications, although the purpose of the visit was to obtain information for the preparation of a report filed in connection with the condominium conversion. Joint Appendix at 294. Stover testified that he determined that "Tneme-crete" was the paint originally applied to the building. Joint Appendix at 291. Having made that determination, he stated that he then consulted the literature which Tnemec published regarding Tneme-crete and its proper application.[1] Joint Appendix at 295. Stover further testified that he consulted the area representative for Tnemec, Charles Ditsler, regarding the proper method of surface preparation and

---

1. In what appears to be promotional literature for Tneme-Crete, Tnemec stated the following concerning application of the paint to painted surfaces: "Previously painted surfaces must be wirebrushed to remove dirt, granular particles and loose paint. Sand or water blasting is recommended if the old film appears excessively chalky or powdery." Joint Appendix at 684. In literature appearing more technical in nature, Tnemec recommended "[r]emov[ing] chalk and old paint not tightly bonded to the surface," patching cracks, and removing all latex coatings. Joint Appendix at 696. In other literature, Tnemec stated that "[i]n case of repaint, remove all scaling paint, oils, greases and loose granular particles." Joint Appendix at 739.

that Ditsler had told him that wirebrushing would be satisfactory.[2]

As indicated earlier, the district court found that Friendship Heights had a "colorable claim of breach of duty" against Koubek's firm.[3] Joint Appendix at 58. The court, however, subsequently concluded that the plaintiff failed to carry its burden of showing that the damages would not have occurred if Stover had performed according to the required standard of care. Finding for the defendant Koubek, the court stated the following:

> The testimony was unchallenged that the new paint adhered to the concrete wherever the first coat of paint had been removed, and all the chips of the newer paint showed that the second coat of paint had adhered to the first coat of paint. The inescapable conclusion is that something about the second coat of paint caused the remainder of the first coat of paint to peel off the building. The plaintiff failed to show why this occurred. And, more importantly, the plaintiff did not show that if Stover had performed the steps which it says should have been performed, the cause of the paint-peeling would have been discovered and a different method of surface preparation would have been recommended. As mentioned above, an architect does not, by agreeing simply to perform work for a client, guarantee the ultimate results, only that he or she will perform with the requisite degree of care and skill.

Joint Appendix at 59.

## II.

We turn now to the rulings of the district court concerning the two witnesses which Friendship Heights offered as experts. Dr. Stella Marusin was proffered by the plaintiff as an expert witness who could testify about the cause of the paint delamination. The district court, however, refused to qualify Dr. Marusin as an expert capable of rendering an opinion as to why the paint peeled. Finding that Dr. Marusin lacked practical experience in the properties of coatings over concrete, the court ruled as follows:

> I am going to allow you to testify, doctor, but not as an expert in the field in which you are here today. Let me say to you that this is by no means any demeaning approach to your qualifications. You are undoubtedly extremely well trained and you are perhaps as knowledgeable as anybody in the United States in the field of which you have. The problem I have is to attempt to relate your qualifications and experience to those who would normally or regularly be accepted as experts in this court or in any court probably in this country. So, I have some problems with that as it relates to your experience with coatings.

Joint Appendix at 101–102. The district court then allowed Dr. Marusin to testify, but only as to the factual findings she made during the course of her investigation of the peeling paint. Joint Appendix at 168–169. The record reveals that Dr. Marusin is a chemical and ceramic engineer, holding master's degrees in chemical and ceramic engineering and a doctorate in silicate sciences. Joint Appendix at 587. She is a member of the American Ceramic Society, the National Institute of Ceramic Engineering, and the American Concrete Institute, including its committee on coatings. A native of Czechoslovakia, Dr. Marusin headed a laboratory in Prague which performed tests to determine the physical, mechanical, and chemical properties of building materials and precast concrete. After nine years in that position, she became the head of the Department of Building Materials at the Research Institute in Prague. Dr. Marusin came to the United

---

**2.** The district court determined, as a matter of fact, that Stover did not call Ditsler until the repainting of The Willoughby was completed. Joint Appendix at 56–57.

**3.** The district court found the applicable law to be that of Maryland and that, under Maryland law, the standard of care to be applied in architectural malpractice cases is whether the architect performed with the skill and care of a reasonably prudent professional. Joint Appendix at 52–54.

States in 1977 and shortly thereafter accepted a position as a materials scientist with a Chicago engineering firm that investigates the cause of construction failure. Dr. Marusin is the author of numerous articles and reports and, at the time of the trial, had submitted for publication an article entitled "Failure of Acrylic Paints and Sealers Over Stone and Brick Masonry."

Responding to the district court's concern about her lack of practical experience, Dr. Marusin explained in detail her experience with coatings on concrete. She testified that she had been involved in a seven-year project in Czechoslovakia that tested various coatings on concrete to determine whether the coatings protected the concrete from weather exposure and pollution. Joint Appendix at 171. Dr. Marusin further stated that she had participated in an American research project involving the testing of coatings over concrete for bridges. Joint Appendix at 93 and 172–174.

Rule 702 of the Federal Rules of Evidence provides that testimony concerning the opinion of experts is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."[4] "Helpfulness is the touchstone of Rule 702." *Breidor v. Sears, Roebuck and Co.*, 722 F.2d 1134, 1139 (3rd Cir.1983). The rule must be broadly interpreted. *Mannino v. International Manufacturing Co.*, 650 F.2d 846 (6th Cir.1981). It is recognized, of course, that the trial court has broad discretion in determining whether to admit expert testimony and should not be reversed absent a clear abuse of discretion. *Garrett v. Desa Industries, Inc.*, 705 F.2d 721 (4th Cir.1983).

Rule 702 further provides that a witness may be qualified as an expert on the grounds of "knowledge, skill, experience, training, or education." Fed.R.Evid. 702 (emphasis added). As this court explained in *Garrett v. Desa Industries, Inc.*, 705 F.2d 721, 724 (4th Cir.1983), the use of the disjunctive indicates that a witness may be qualified as an expert on any one of the five listed grounds. In *Garrett*, the plaintiff sued the manufacturer of a stud driver seeking damages for an eye injury he sustained when the equipment discharged accidentally. The plaintiff offered as an expert witness a naval gunnery officer and registered engineer with a master's degree in mechanical engineering. While the officer had no specific experience with stud drivers prior to the litigation, he was familiar with small arms using cartridges similar to those used in stud drivers. Citing the officer's lack of practical experience with stud drivers, the district court refused to allow him to give his opinion on the ultimate issue of whether the equipment was negligently manufactured. The trial court allowed the witness to testify only as to the findings of his tests on the stud driver used by the plaintiff.

This court, in an opinion written by Judge Ervin, found that the district court in *Garrett* abused its discretion by limiting the scope of the testimony. Judge Ervin pointed out that the witness, as a professional engineer and gunnery officer, was qualified to testify as an expert on the basis of his education, knowledge, training and skill—four of the five listed grounds. Thus, the fact that he lacked experience with the particular item at issue did not preclude his testifying as an expert. Citing Rule 704, Judge Ervin also stated that, if a witness has been qualified to testify as an expert, he should be allowed to render an opinion on the ultimate issue in the case.[5]

 In the present case, Dr. Marusin is qualified to testify as an expert by virtue

---

**4.** Rule 702, in its entirety, reads as follows: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

**5.** Rule 704 provides the following:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

of her education, knowledge, and training. As the holder of master's degrees in chemical and ceramic engineering and a doctorate in silicate sciences, Dr. Marusin was qualified by her education to opine why paint, a chemical substance, might peel off concrete, a building material with which she had extensive experience. Dr. Marusin was also qualified by her knowledge and training. She spent years in various positions as a chemical and ceramic engineer and later as a materials scientist. Furthermore, Dr. Marusin was arguably qualified as an expert on the basis of her experience. She participated in research projects testing the properties of various coatings over concrete in this country and in Czechoslovakia. Assuming for the sake of argument that the district court was correct in its assessment that Dr. Marusin lacked practical experience, she was still qualified as an expert on the basis of her education, knowledge, and training. Thus, we find that the district court abused its discretion in refusing to qualify Dr. Marusin as an expert capable of rendering an opinion on the cause of the paint delamination.

■ Koubek argues that the ruling of the district court, if error, was harmless. See Fed.R.Evid. 103. Koubek contends

that most of the proffered testimony of Dr. Marusin was admitted as she testified regarding her findings of fact made during her investigation and that the district court simply chose not to credit her testimony.

To a certain extent, the defendant is correct. Dr. Marusin did testify about her findings of fact which, taken together, indicated her conclusions as to the cause of the peeling paint.[6] Dr. Marusin was, however, prevented from giving her expert opinion on the crucial issue of why the paint peeled.[7] It is also clear that the district court concluded that the plaintiff failed to prove the reason for the peeling paint and that this failure of proof contributed to his decision in favor of the defendants. Joint Appendix at 59. Thus, we cannot say that the district court's ruling concerning Dr. Marusin was harmless error.

### III.

■ Friendship Heights offered William Edward White, an architect and structural engineer, as an expert to testify concerning the standard of care required of an architect who is drafting specifications for the repainting of a building. The record indicates that Mr. White holds an undergraduate degree in architecture. He has prac-

---

6. Dr. Marusin testified, for example, that there were numerous micro-cracks on the inner surface of the old layer of paint, Joint Appendix at 179; that the inner surface of the paint chips contained the skin portion of the concrete surface, Joint Appendix at 177; and the development of micro-cracks was the first step in the peeling process, Joint Appendix at 196. She stated that the bond between the first and second coats of paint was very good. Joint Appendix at 178. Dr. Marusin went on to explain that the second layer of paint was too heavy and that the first layer could not support the second layer. She also explained that there were differences in the thermal expansion and contraction properties of the old and new layers of paint. Joint Appendix at 198. Dr. Marusin further pointed out that wire brushing would not remove all paint containing micro-cracks and that sandblasting was necessary to remove all the old paint. Joint Appendix at 199–200.

7. In commenting on Dr. Marusin's qualifications, the district court stated the following:
 I have no objection if—certainly she can testify as to findings that she made and what those findings were, either in the laboratory

or on the scene.... But I will not allow here [sic] to give opinions as far as the ultimate issue in this case as to whether or not—or one of the issues, anyhow, is the cause of the condition here, why didn't the work done in 1981 do as it should have done, and what caused the condition as it exists. I don't think she has the qualifications to do it.
Joint Appendix at 169.
 Later, during Dr. Marusin's testimony, the following exchange occurred:
 Q: Did your findings with respect to the existing micro-cracks and your findings with respect to the existence of different thermal properties concerning the two paints and your findings concerning different bonding strengths lead you to any conclusion as to the cause of the delamination?
 A: Yes.
 Q: What conclusions did you reach?
 Mr. Claiborne: Objection.
 Mr. Goldberg: Your Honor, I object.
 The Court: Sustained.

ticed for a number of years, primarily as a structural engineer, but also as an architect. White has apparently had extensive experience in drafting specifications and has handled numerous repair or rehabilitation projects. Mr. White and Dr. Marusin work for the same Chicago engineering firm.

The district court refused to qualify Mr. White as an expert. Instead, he was allowed to testify as a lay witness pursuant to Rule 701 of the Federal Rules of Evidence. Consistent with that ruling, the trial court did not permit Mr. White to express an opinion as to whether Stover would have specified a different method of surface preparation if Stover had followed certain required steps. Joint Appendix at 156.

The basis for the district court's refusal to qualify Mr. White as an expert is somewhat unclear. The court did not state its reasons for the ruling. Joint Appendix at 135. Earlier, however, the court had expressed concern about Mr. White's definition, or lack thereof, of the relevant architectural standard of care in situations such as this. The court, counsel for the plaintiff, and Mr. White engaged in the following colloquy about the standard of care:

> MR. VETTORI: Your Honor, I would tender Mr. White in the field of architecture sufficient to render opinions in this case.
>
> THE COURT: As an architect generally?
>
> MR. VETTORI: Generally as an architect and specifically to render opinions as to whether the standard of care relating to specifications was met in this case.
>
> MR. GOLDBERG: I will object.

THE COURT: The problem is—as I understand it, Mr. White, you said there are no standards of care involved, right?

MR. VETTORI: That is not the way I understood his testimony, Your Honor.

THE COURT: I asked if there are standards, and I think you said there are no standards of conduct, that there are guidelines to follow?

THE WITNESS: That is what I said, I believe, that that sets a standard of care, those guidelines.

MR. VETTORI: Your Honor, if I may, obviously, your understanding of the testimony is going to control in your ruling, but I think Mr. White clearly testified that in his opinion there are steps that must be taken by an architect in connection with the preparation.

THE COURT: He said there are steps to follow. Is that what you said?

THE WITNESS: Yes.

THE COURT: But there is no standard, as I understand at least, of conduct to follow. There are steps to follow, but no standard of conduct. It may be a fine difference, but it could be an important difference.

Joint Appendix at 123–124.[8] Mr. White was then allowed to testify about the steps that an architect should follow in preparing specifications for repainting a building. Joint Appendix 137–157. Mr. White testified, for example, that the first step is to conduct a thorough investigation and inspection of the building. Next, he stated that an architect should determine whether any testing was required to learn more about the condition of surface. Mr. White testified that, in connection with this investigatory phase, an architect should contact the paint manufacturer and should consult

---

**8.** Mr. White was apparently confused at first because he thought, as the following colloquy indicates, that he was being asked whether there was a standard set of specifications:

> The Court: ... Is there in the architectural profession a standard that is followed in the preparation of specifications?
>
> * * * * * *
>
> The Witness: There is not a particular specification that is actually duplicated for every project. There are formats available and lev-

els of care that are normally considered appropriate for the preparation of construction documents.

> The Court: But no standard as such?
>
> The Witness: I don't know of a "standard." Joint Appendix at 1142. When counsel later clarified the question, Mr. White replied that, in his opinion, "there is a standard or at least a series of steps that are necessary for the proper preparation of specifications." Joint Appendix at 116.

the literature published by the manufacturer, particularly when that literature recommended sandblasting if the old paint looked powdery or chalky. Mr. White also stated that, to determine whether an additional coat of paint could be put over the original coat, an architect should consult a materials testing firm that specialized in that kind of investigation.

Following Mr. White's recitation of the required steps in preparing specifications, the trial court allowed plaintiff's counsel to pose a hypothetical question based on the facts of the present case. Mr. White was asked whether, under the circumstances of this case, the author of the specifications exercised the standard of care normally required in drafting such specifications. The district court, over objection, allowed Mr. White to respond. Mr. White stated that, in his opinion, the architect had not complied with the relevant standard of care. Joint Appendix at 156. Counsel next asked Mr. White the crucial question. He asked whether the prudent architect would have recommended a different method of surface preparation if the steps outlined by Mr. White had been followed. The court, sustaining an objection, refused to allow the witness to answer. Joint Appendix at 156.

As indicated earlier, Rule 702 states that a witness may be qualified as an expert for his knowledge, skill, experience, training, *or* education. Although there is some indication in the record that Mr. White was more experienced as a structural engineer than as an architect and that he lacked extensive experience in drafting specifications for coatings over concrete, Mr. White was still sufficiently qualified by his education, knowledge, and experience to testify as an expert. As such, he should have been allowed to express his opinion on the ultimate issue of whether Stover would have recommended a different method of surface preparation if he had performed according to the required standard of care.

■ Koubeck argues that the trial court was correct in refusing to allow Mr. White to testify as an expert witness, because of his lack of experience in preparing specifications for coatings and because of Mr. White's failure to define the minimum standard of care required of architects in drafting such specifications. As we have already explained, Mr. White was sufficiently qualified under Rule 702 to testify as an expert witness. We do not consider White's alleged failure to identify a minimum standard of care a sufficient ground for disqualifying him as an expert. First, Mr. White did in fact explain what he viewed as the appropriate standard of care by describing the steps or guidelines that the architect should follow. Joint Appendix at 137–153. This would appear to be an acceptable way of defining the relevant professional standard of care under Maryland law. *See, e.g., Crockett v. Crothers,* 264 Md. 222, 285 A.2d 612 (1972) (in negligence action against engineer for failing to discover water main later broken by a contractor, standard of care was established through testimony describing steps ordinarily taken by engineers preparing plans for construction of a city sewerage system).

■ Second, the failure to define or explain the appropriate standard of care in a satisfactory manner is relevant to the witness' credibility as an expert, not the witness' qualifications to testify. If a witness qualifies on any of the grounds listed in Rule 702, he should be allowed to testify as an expert. Should the witness later fail to adequately define or describe the relevant standard of care, opposing counsel is free to explore that weakness in the testimony. The trier of fact may then choose to discount the testimony. *See, e.g., Ellis v. K–Lan Co.,* 695 F.2d 157, 161 (5th Cir. 1983) (citing Rule 702, the court held an expert witness may testify about the defectiveness of a product even though he is unfamiliar with definitions or standards set by statutes or regulations concerning the product because the failure of the expert to be familiar with a statutory definition or standard affects his credibility, not his qualifications to testify).

Koubek also argues that the district court's refusal to qualify Mr. White as an expert, if error, was not reversible error. Koubek points out that although Mr. White was allowed to testify concerning the steps that an architect should follow in preparing specifications for repainting a building, there was no indication, by proffer or otherwise, of the testimony Mr. White was precluded from giving.

Clearly, however, the testimony that Mr. White was not permitted to give was whether, in his opinion, Stover would have recommended a different method of surface preparation if Stover had followed the steps outlined by Mr. White. Joint Appendix at 156. As with Dr. Marusin, we cannot say that the refusal to qualify Mr. White as an expert was harmless error in light of the district court's finding that "the plaintiff did not show that if Stover had performed the steps which it says should have been performed, the cause of the paint-peeling would have been discovered and a different method of surface preparation would have been recommended." Joint Appendix at 59. The district court abused its discretion in not allowing Mr. White to testify as an expert witness, capable of rendering an opinion on ultimate issues in the case.[9]

## IV.

Finally, we turn to the district court's rulings concerning the plaintiff's claim against Tnemec, the manufacturer of the paint, and Koubek's cross-claim against Tnemec. At trial, Friendship Heights' sole claim against the paint manufacturer was for breach of an implied warranty of fitness for a particular purpose. The district court found for Tnemec after concluding that Tnemec had no knowledge of any particular purpose for which Friendship Heights intended to use the paint prior to the repainting of The Willoughby. We

agree and accordingly affirm the judgment of the district court.

Turning to Koubek's cross-claim against Tnemec, we again find ourselves in agreement with the district court. We consider meritless Koubek's claims for breach of implied warranties of merchantability or fitness for a particular purpose, negligence in the manufacture and testing of the paint, and misrepresentations in instructions for surface preparation and application of the paint.

## V.

In summary, we find that the district court abused its discretion in refusing to qualify Dr. Marusin and Mr. White as expert witnesses. Accordingly, the judgment of the district court as to Koubek is reversed, and the case is remanded for a new trial in accordance with this opinion. The judgment of the district court as to Tnemec is affirmed.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

9. The appellee considers it "noteworthy" that the trier of fact in this case was a judge instead of a jury. Brief of Appellees at 12. We do not find this to be a factor justifying a different result than the one we have reached. Rule 702 speaks in terms of assisting the trier of fact. It makes no distinction in its application depending on whether the trier of fact is a judge or a jury. Although a district judge who is functioning as the trier of fact is not bound to accept the testimony of an expert witness, he may not abuse his discretion in refusing to hear such testimony.